ORDERED.

**Dated:  June 26, 2023**

Caryl E. Delano
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
www.flmb.uscourts.gov

In re:                                                              Case No. 2:20-bk-01595-FMD
                                                                        Chapter 7
John Steven Jeffries,

               Debtor.
_____/

Webber Commercial Properties LLC,

               Plaintiff,

v.                                                                   Adv. Pro. No. 2:20-ap-655-FMD

John Steven Jeffries,

               Defendant.
_____/

## FINDINGS OF FACT,
## CONCLUSIONS OF LAW, AND MEMORANDUM OPINION

     For more than a decade, Webber Commercial Properties LLC ("Plaintiff") has

attempted to recover from John Steven Jeffries ("Debtor") on his guaranty of a lease.

Plaintiff, the landlord under the lease, began its collection efforts after a purchaser of Debtor's business defaulted on the lease. When Plaintiff obtained a judgment against Debtor on his guaranty, he filed this Chapter 7 bankruptcy case.

In Debtor's main bankruptcy case, Plaintiff filed an *Objection to Debtor's Claim of Exemption* (the "Objection to Exemption"),[1] and in this adversary proceeding, Plaintiff filed a *Complaint Objecting to Discharge of Debtor Pursuant to 11 U.S.C. § 727* (the "Complaint").[2]

On March 28, 2023, the Court held a combined trial on the Objection to Exemption and the Complaint. After carefully considering the exhibits, the testimony, and the parties' written closing arguments,[3] the Court concludes that Plaintiff did not meet its burden of proving that Debtor's exemption was not properly claimed or that Debtor's discharge should be denied under 11 U.S.C. § 727(a)(2), (a)(3), or (a)(4).[4]

## I.    FACTS

Debtor is a 73-year-old individual with no formal business training.[5] He and his wife, Barbara, have been married for 25 years.[6] Debtor's bank accounts at

---

[1] Main Case, Doc. No. 100.
[2] Doc. No. 1.
[3] Doc. Nos. 148, 149.
[4] Unless otherwise stated, statutory references are to the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.*
[5] Doc. No. 144, Trial transcript, pp. 208-09.
[6] *Id.* at 118.

SunTrust Bank, Synovus Bank, and Achieva Credit Union are joint accounts with Barbara. Debtor testified that other than the joint accounts, he does not own any bank accounts.[7]

Between 2009 and 2011, Debtor owned and operated a barbecue and sports bar known as "Porky's" in commercial space that Porky's leased from Plaintiff. In April 2011, Debtor sold his interest in Porky's to an unrelated third party. To obtain Plaintiff's consent to the assignment of the lease, Debtor and Porky's signed a lease amendment in which they agreed to remain liable for the rent and related obligations.[8] In February 2012, after the purchaser defaulted under the lease, Plaintiff sued Porky's and Debtor in the Circuit Court for Lee County, Florida (the "Porky's Lawsuit").[9]

Since at least 2014, Debtor has owned a residential property in Cape Coral, Florida (the "Cape Coral Property"). The Cape Coral Property is encumbered by a mortgage held by Synovus Bank in the original amount of $75,000.00. In March 2015, Debtor and Barbara signed an *Additional Advance Mortgage Modification Agreement* to borrow an additional $35,000.00 from Synovus Bank under the mortgage (the "Synovus Funds").[10] Debtor initially asserted that he and Barbara gave the Synovus

---

[7] Doc. No. 144, Trial transcript, pp. 40, 120-21.
[8] Doc. No. 129-4, Def's Ex. 4, ¶ 6; Doc. No. 131-9, Pl's Ex. 19, ¶ 6.
[9] Doc. No. 129-4, Def's Ex. 4, ¶ 10; Doc. No. 131-9, Pl's Ex. 19, ¶ 10.
[10] Doc. No. 131-10, Pl's Ex. 20, pp. 36-38.

Funds to Debtor's son, Chad Jeffries ("Chad"),[11] but he testified at trial that he was remodeling his home at the time and did not know whether he gave any of the Synovus Funds to Chad.[12]

In December 2015, Debtor and Barbara purchased a home located on Narwhal Lane in Punta Gorda, Florida (the "Narwhal Home").[13] On March 29, 2016, they signed a *Mortgage for Use with Secured Revolving Credit Agreement* with SunTrust Bank.[14] Under the mortgage, which was secured by the Narwhal Home, the maximum amount of debt that Debtor could owe to SunTrust at any time was $100,000.00.[15]

In November 2016, Debtor and Barbara signed a *Modification of Mortgage* with SunTrust to increase the maximum debt secured by the Narwhal Home from $100,000.00 to $120,000.00 (the "SunTrust Funds").[16] Debtor testified that he deposited the SunTrust Funds into a joint checking account with Barbara, and that they were used both to remodel the Narwhal Home and to give to Chad for his pool project.[17]

---

[11] Doc. No. 131-10, Pl's Ex. 20, p. 10.

[12] Doc. No. 144, Trial transcript, pp. 52-53.

[13] Doc. No. 129-17, Def's Ex. 17. Debtor and Barbara lived at the Narwhal Home from 2016 to October 2019 (Doc. No. 130-1, Pl's Ex. 1, p. 35).

[14] Doc. No. 129-18, Def's Ex. 18.

[15] Doc. No. 129-18, Def's Ex. 18, p. 7.

[16] Doc. No. 129-19, Def's Ex. 19.

[17] Doc. No. 144, Trial transcript, p. 119. Although Debtor testified that the SunTrust Funds "went to the checking account and it went from the checking account to Chad," he did not produce copies of any checks evidencing the transfer to Chad. (Doc. No. 144, Trial transcript, p. 55.)

In October or November 2016, Debtor gave or loaned $48,000.00 to Chad to enable Chad to install a swimming pool at Chad's home (the "Pool Funds").[18] Chad's record of disbursements for his "pool project" reflects "48k given" and "last money given 5k," so Debtor may have given him $53,000.00.[19] Debtor and Chad did not document the terms of the arrangement in writing.[20]

Although Debtor testified at his deposition that he loaned the Pool Funds to Chad,[21] he testified at trial that he and Barbara gave Chad the Pool Funds from their joint funds and that he did not consider them a loan.[22] Chad testified at trial that the Pool Funds were a gift from his mother and father, although he previously testified in deposition that he borrowed the funds from his father because he did not have the money to build the pool.[23]

According to Chad's record of disbursements for his pool project, the installation of the pool took more than eight months, and Chad made payments to contractors and suppliers until at least May 2017.[24]

---

[18] Debtor attested in an affidavit dated January 7, 2022, that he and Barbara gave Chad $48,000.00 "on or about October 5, 2016." (Doc. No. 129-4, Def's Ex. 4, ¶ 20; Doc. No. 131-9, Pl's Ex. 19, ¶ 20.) At trial, Chad was asked when he received the Pool Funds and he answered, "Not all at once. So I got the first one would have been covered 11/3/16 for sure with – with the money." (Doc. No. 144, Trial transcript, p. 163.) Chad's testimony is consistent with his record of disbursements for the pool project showing his first significant expenditures on November 3, 2016, November 29, 2016, and November 30, 2016. (Doc. No. 131-6, Pl's Ex. 16, p. 65.)

[19] Doc. No. 131-6, Pl's Ex. 16, p. 65.

[20] Doc. No. 144, Trial transcript, pp. 121-22, 183-84.

[21] Doc. No. 131-2, Pl's Ex. 12, pp. 6-7.

[22] Doc. No. 144, Trial transcript, pp. 36, 40, 43.

[23] Doc. No. 144, Trial transcript, pp. 157-60.

[24] Doc. No. 131-6, Pl's Ex. 16, p. 65.

Starting in September 2017, and continuing for the next two and a half years, Chad gave checks to Debtor every month to repay the Pool Funds. The 30 checks were made payable solely to Debtor—not jointly to Debtor and Barbara.[25] Generally, Chad wrote each check in the amount of $610.00 and hand-wrote the words "pool loan" on the memo line. Debtor testified that he deposited the checks into a joint checking account owned with Barbara at SunTrust Bank ("Joint Account 5597").[26] The bank statements for Joint Account 5597 reflect a series of $610.00 deposits in 2018 and 2019.[27]

In early 2018, Debtor and Chad began working for Bear Coast Construction ("BCC"), a company that Chad's friend, Barry Berger, owns and operates.[28] Shortly after Debtor and Chad started work with BCC, Chad began operating Bear Coast Remodeling ("BCR") as a "division" of BCC, using BCC's construction license.[29] Mr. Berger testified that BCC had an inactive bank account ("BCC Account 9029") that he allowed Chad to use for BCR's business.[30] During the time that BCR operated as

---

[25] Doc. No. 131-6, Pl's Ex. 16, pp. 69-98.

[26] Doc. No. 144, Trial transcript, p. 57.

[27] Doc. No. 129-6, Def's Ex. 6; Doc. No. 129-7, Def's Ex. 7.

[28] Doc. No. 129-4, Def's Ex. 4, ¶¶ 13-14; Doc. No. 131-9, Pl's Ex. 19, ¶¶ 13-14.

[29] Doc. No. 129-4, Def's Ex. 4; Doc. No. 131-9, Pl's Ex. 19. *See also* Doc. No. 129-3, Def's Ex. 3, Deposition transcript of Barry Berger, pp. 7-10.

[30] Doc. No. 129-3, Def's Ex. 3, Deposition transcript of Barry Berger, pp. 8-9. *See also* Doc. No. 129-2, Def's Ex. 2, Deposition transcript of Chad Jeffries, p. 32 ("[W]e had two accounts. I had one for BCC, and Barry had one for BCC.").

a division of BCC, Debtor's duties included purchasing construction materials from suppliers and delivering the materials to BCR's job sites.[31]

Between January and April 2018, Debtor made 20 cash deposits of varying amounts into Joint Account 5597, totaling $12,984.55.[32] At trial, Debtor testified that he only earned small amounts from his "side jobs," and he does not know the source of the cash.[33]

Between April 2018 and May 2019, in addition to his paychecks, Debtor received 19 checks written on BCC Account 9029. The checks, in varying amounts, totaled $20,492.28.[34] Chad signed each of the checks and included the notation "reimbursement" on the checks' memo line. Debtor testified that the checks were to reimburse him for materials he purchased for BCC or BCR using his personal credit card.[35] Debtor also testified that he gave the purchase receipts to BCR "to get payment" and that he did not have any receipts to produce to Plaintiff in discovery.[36] Chad testified that he kept the receipts in a filing cabinet and that he had produced copies of all receipts in his possession to Plaintiff in discovery.[37] However, Plaintiff

---

[31] Doc. No. 144, Trial transcript, pp. 125-26.
[32] Doc. No. 132-6, Pl's Ex. 29.
[33] Doc. No. 144, Trial transcript, p. 94.
[34] Doc. No. 132-8, Pl's Ex. 31.
[35] Doc. No. 144, Trial transcript, pp. 82-83.
[36] *Id.*, pp. 91, 126.
[37] *Id.*, pp. 174-75.

contends that Chad did not produce any receipts or back-up documents for the reimbursement checks in response to its subpoena.[38]

On August 10, 2018, Chad paid Debtor $17,000.00 to purchase Debtor's 2012 Dodge Ram pickup truck (the "Truck"), using a check he signed on BCC Account 9029 with the notation "Ram purchase."[39] Debtor testified that he sold the Truck because he could not afford the payments and that he established the sale price by looking at the value of comparable trucks.[40] Chad also testified that he determined the value of the Truck by reviewing NADA (a recognized compilation of used vehicle values), and that Debtor's outstanding loan on the Truck as of the purchase date was "near $17,000.00."[41] Plaintiff did not dispute the outstanding balance of the loan against the Truck or establish that the purchase price was unreasonable.

Debtor testified that Chad purchased the Truck on BCR's behalf because Chad had not yet formed BCR as a separate company, and that Chad, as BCR's sole owner, is "one in the same" as BCR.[42] Debtor and Chad both testified that after the sale of the Truck, Debtor drove it solely "for the company business"[43] and that other employees of BCC or BCR also drove the Truck.[44]

---

[38] Doc. No. 148, p. 11.
[39] Doc. No. 129-4, Def's Ex. 4, ¶ 16; Doc. No. 131-9, Pl's Ex. 19, ¶ 16; Doc. No. 130-5, Pl's Ex. 5.
[40] Doc. No. 144, Trial transcript, pp. 113-14.
[41] *Id.*, p. 176.
[42] *Id.*, pp. 81, 113-14.
[43] Doc. No. 131-2, Pl's Ex. 12, Deposition of Debtor, p. 10.
[44] Doc. No. 144, Trial transcript, pp. 114, 176.

In April 2019, Chad formed BCR as a separate corporation, with Chad as its owner and manager.[45] After its formation, BCR continued to employ Debtor to purchase materials for its remodeling business.[46]

On April 21, 2019, Chad wrote a check to Debtor on BCC Account 9029 in the amount of $3,000.00 with the words "loan payment" handwritten on the memo line.[47] Debtor and Chad both testified that they did not know why the check was written, but that Debtor had never loaned any money to BCC or BCR.[48]

On May 1, 2019, Debtor transferred the Truck's title to BCR.[49] Chad testified that he waited to have the title transferred until BCR had been formed as a separate entity from BCC and had its own operating bank account.[50]

On his 2018 federal income tax return, Debtor claimed $26,560.00 in income from his salary or wages and $9,262.00 in net profit from his business of "construction remodeling, home remodeling."[51] However, Debtor testified at trial that he has not owned a business since he sold Porky's in 2011, that his only employment in 2018 was with BCC or BCR, and that the business income on the 2018 return "probably would have been rental [from the Cape Coral Property]."[52]

---

[45] Doc. No. 129-4, Def's Ex. 4, ¶ 13; Doc. No. 131-9, Pl's Ex. 19, ¶ 13.
[46] Doc. No. 144, Trial transcript, pp. 125-26.
[47] Doc. No. 132-5, Pl's Ex. 28.
[48] Doc. No. 144, Trial transcript, pp. 59-60, 184.
[49] Doc. No. 130-6, Pl's Ex. 6.
[50] Doc. No. 144, Trial transcript, pp. 179-80.
[51] Doc. No. 130-3, Pl's Ex. 3, pp. 23-31.
[52] Doc. No. 144, Trial transcript, pp. 124, 142.

On his 2019 federal income tax return, Debtor claimed $32,640.00 in income from his wages or salary, and $4,000.00 in net profit from his business of "construction remodeling, home remodeling."[53] Debtor testified that the "net profit" actually represented his Christmas bonus from BCR.[54]

On February 25, 2020, Plaintiff obtained a judgment against Debtor for $159,944.20 in the Porky's Lawsuit.[55] On the same day, Debtor filed a Chapter 7 bankruptcy petition—his third Chapter 7 case over the course of 25 years.[56]

On his original petition, schedule of assets, and Statement of Financial Affairs ("SOFA"), Debtor made the following representations:[57]

A.      He was not a sole proprietor of any full- or part-time business.[57]

B.      He was not owed any amount of money by anyone, such as on an unpaid loan.[58]

C.      Within two years before his bankruptcy petition, he did not sell or transfer any property to anyone, other than in the ordinary course of business.[59]

D.      Within four years before his bankruptcy petition, he did not own a business or have any connection to a business as a sole proprietor, a member of a

---

[53] Doc. No. 130-3, Pl's Ex. 3, pp. 6-19.
[54] Doc. No. 144, Trial transcript, p. 141.
[55] Doc. No. 132-10, Pl's Ex. 33, pp. 5-6.
[56] Debtor's first Chapter 7 case was filed in 1996, Case No. 2:96-bk-17212, and his second Chapter 7 case was filed in 2004, Case No. 2:04-bk-01108.
[57] Doc. No. 130-1, Pl's Ex. 1, p. 5.
[58] *Id.*, p. 16.
[59] *Id.*, p. 39.

limited liability company, a partner in a partnership, an officer or director of a corporation, or an owner of at least 5% of a corporation.[60]

At the outset of Debtor's bankruptcy case, Plaintiff represented to the Court its belief that Debtor was the actual owner of BCC and/or BCR, or that Debtor had transferred property to BCC and/or BCR and was "receiving a portion of those assets back in the form of income."[61] Plaintiff embarked on an aggressive course of discovery to investigate its claims, issuing 14 non-party subpoenas in Debtor's main case under Federal Rule of Bankruptcy Procedure 2004[62] and 10 non-party subpoenas in this adversary proceeding under Federal Rule of Bankruptcy Procedure 7034.[63] Some of the subpoenas were directed to Chad, BCC, BCR, and Barry Berger.

On August 18, 2020, Debtor filed an amended SOFA in which he stated that he sold the Truck to Chad in August 2018 for "$17,000; net proceeds after payoff of loan approximately $500."[64]

---

[60] *Id.*, pp. 40-41.

[61] *See* Main Case, Doc. No. 17, ¶ 6; Doc. No. 64, ¶¶ 6 and 7; Doc. No. 82, ¶ 4.

[62] Main Case, Doc. No. 24 (Chad Jeffries); Doc. No. 25 (Barry Berger); Doc. No. 36 (Wells Fargo Bank); Doc. No. 37 (SunTrust Bank); Doc. No. 38 (American Express Company); Doc. No. 39 (Capital One Bank N.A.); Doc. No. 40 (Capital One N.A.); Doc. No. 41 (Suncoast Credit Union); Doc. No. 42 (Bank of America Corporation); Doc. No. 43 (Synovus Bank); Doc. No. 44 (USAA Bank); Doc. No. 45 (Achieva Credit Union); Doc. No. 47 (AAA Life Insurance); and Doc. No. 61 (USAA Life Insurance Company).

[63] Doc. Nos. 16 and 19 (BCR); Doc. Nos. 17, 20, 37, and 50 (BCC); Doc. Nos. 18 and 22 (Chad Jeffries); Doc. Nos. 28, 34, and 47 (Hansen Screen Enclosures, Inc.); Doc. Nos. 30, 36, and 43 (Synovus Bank/FCB); Doc. Nos. 31, 33, and 46 (First Horizon Bank); Doc. Nos. 32, 38, and 44 (SunTrust Bank); Doc. Nos. 35 and 45 (Land Trust Service Corp.); Doc. Nos. 39 and 48 (Achieva Credit Union); and Doc. Nos. 40 and 49 (Bank of America Corporation).

[64] Doc. No. 130-4, Pl's Ex. 4, p. 5; Main Case, Doc. No. 33, p. 5.

On June 16, 2022, Debtor filed an amended schedule of assets to list the balance of the Pool Funds as an outstanding loan owed to him from Chad. Debtor described the Pool Funds as a "potential loan receivable owed from Debtor's son (claim is most likely unenforceable)" and valued the receivable at $30,000.00 after crediting the payments received from Chad. At the same time, Debtor filed an amended schedule of exemptions in which he claimed the Pool Funds as exempt tenancy by the entireties property under § 522(b)(3)(B).[65] The Chapter 7 trustee, who is charged with collecting assets of the bankruptcy estate and investigating the debtor's financial affairs, did not object to Debtor's claim of exemption.[66]

On March 28, 2023, after the Court had narrowed the issues for trial in its ruling on the parties' motions for summary judgment,[67] the Court conducted a trial on Plaintiff's Objection to Exemption and outstanding factual disputes in Plaintiff's Complaint.[68] At trial, the Court heard the testimony of Debtor and Chad, and admitted into evidence 32 exhibits submitted by Plaintiff and 23 exhibits submitted by Debtor. Following trial, Plaintiff and Debtor filed their written closing arguments.[69]

---

[65] Doc. No. 131-8, Pl's Ex. 18, pp. 7-8, 11; Main Case, Doc. No. 99, pp. 7-8, 11.

[66] 11 U.S.C. § 704(a). Under Fed. R. Bankr. P. 4003(b)(1), a party in interest may object to a claim of exemption within 30 days after the filing of an amendment claiming the exemption.

[67] *Amended Order (1) Denying Plaintiff's Motion for Summary Judgment, and (2) Granting in Part and Denying in Part Defendant's Motion for Summary Judgment* (Doc. No. 118).

[68] Doc. Nos. 139 and 144.

[69] Doc. Nos. 148 and 149.

## II.    ANALYSIS

The two issues before the Court are whether the Pool Funds are exempt entireties property and whether Debtor's discharge should be barred under § 727(a).

### A.    The Pool Funds are exempt entireties property.

Plaintiff objects to Debtor's claim that the Pool Funds are exempt entireties property on two grounds. First, Plaintiff contends that Debtor is not entitled to the exemption because he did not schedule the Pool Funds as an asset and claim them exempt until nearly two years after he filed his bankruptcy case— and after Plaintiff discovered the transaction. Second, Plaintiff contends that the Pool Funds are not entireties property because they were not jointly owned by Debtor and Barbara.

Debtor asserts that he did not initially list the Pool Funds on his bankruptcy schedules and claim them as exempt because he did not think they were an asset. Rather, he considered the Pool Funds to be a gift to Chad made more than three years before his bankruptcy case.

Under Federal Rule of Bankruptcy Procedure 4003(c), a party objecting to an exemption claimed in a bankruptcy case bears the burden of proof to show that the exemption is not properly claimed.[70]

_____

[70] Fed. R. Bankr. P. 4003(c).

### 1.    Debtor may amend his schedules to claim the Pool Funds as exempt entireties property.

Under Federal Rule of Bankruptcy Procedure 1009(a), a debtor may amend a schedule at any time before his case is closed.[71] As the bankruptcy court held in *In re Kauffman*, an amendment generally should not be disallowed unless an objecting party clearly shows bad faith on the part of the debtor or prejudice to creditors.[72] And an objecting party does not show prejudice simply by showing that allowance of an amendment will result in allowance of an exemption.[73]

The Court finds that Debtor's belated amendment to his schedules was not in bad faith. As discussed below, the evidence sufficiently establishes that the source of the Pool Funds was exempt entireties property, and there is at least some evidence—Debtor's and Chad's testimony that the transaction was not documented as a loan and that Chad's payments were purely voluntary—to support Debtor's original belief that the Pool Funds were a gift that he was not required to list on his bankruptcy schedules. Therefore, the Court will not disallow Debtor's exemption solely because of his delay in filing the amendment and will next consider whether the Pool Funds are exempt entireties property.

---

[71] Fed. R. Bank. P. 1009(a).
[72] *In re Kauffman*, 299 B.R. 641, 644 (Bankr. M.D. Fla. 2003).
[73] *Id*. at 644.

   **2.    Plaintiff has not met its burden to show that the Pool Funds are not exempt entireties property.**

To qualify as exempt entireties property in Florida, the property must satisfy the unities of marriage, possession, interest, title, and time, with a right of survivorship.[74] Florida common law establishes a "presumption in favor of a tenancy by the entireties when a married couple jointly owns personal property."[75]

Here, Debtor asserts that he holds the Pool Funds with Barbara as tenants by the entireties and properly claimed them as exempt because (a) he and Barbara have been married for 25 years; (b) he and Barbara jointly purchased the Narwhal Home during their marriage; (d) the source of the Pool Funds was the SunTrust Funds; (d) the SunTrust Funds were deposited into a joint bank account with Barbara and then provided to Chad; (e) Debtor deposited Chad's checks in "repayment" of the Pool Funds into Joint Account 5597; and (f) Debtor doesn't have any bank accounts other than the joint accounts with Barbara.[76]

Plaintiff contends that the exemption should be disallowed because (a) Debtor and Chad originally testified that Debtor—not Debtor and Barbara—provided the Pool Funds to Chad; (b) Debtor has not produced any evidence, such as a check or wire transfer, showing that the Pool Funds were transferred to Chad from a joint

---

[74] *In re Ingole*, 2023 WL 2729665, at *4 (Bankr. M.D. Fla. Mar. 31, 2023); *In re Collins*, 600 B.R. 108, 113 (Bankr. M.D. Fla. 2019).

[75] *In re Collins*, 600 B.R. at 114 (quoting *Beal Bank, SSB v. Almand & Associates*, 780 So.2d 45, 57 (Fla. 2001)).

[76] Doc. No. 149, p. 10.

bank account; and (c) Chad repaid the Pool Funds with checks written only to Debtor, not to Debtor and Barbara.[77]

In other words, Plaintiff contends that without checks or other documents showing the transfer of the Pool Funds to Chad, there is no direct evidence that Debtor provided the Pool Funds to Chad from a joint bank account with Barbara. But Plaintiff does not dispute that (a) Debtor and Barbara jointly own the Narwhal Home, and (b) they jointly obtained the Synovus Funds and the SunTrust Funds about the time that they provided the Pool Funds to Chad.

The record does not clearly show whether the source of the Pool Funds was the Synovus Funds or the SunTrust Funds, or both. And the Court recognizes that Debtor and Chad did not initially testify in their depositions that the Pool Funds were a joint gift from Debtor and Barbara. However, Debtor and Chad were credible witnesses at trial, and Plaintiff did not present any evidence (a) to show that the Pool Funds originated from any asset that was owned solely by Debtor, or (b) to contradict Debtor's testimony that all of his bank accounts are joint accounts with Barbara. In addition, the Court finds that Debtor's deposit of Chad's repayment checks into a joint account with Barbara—as corroborated by the SunTrust bank statements for

---

[77] Doc. No. 148, pp. 6-7, 23-24.

Joint Account 5597[78] — is persuasive on the issue of the character of the Pool Funds as entireties property.

After weighing the evidence, the Court finds that Plaintiff did not satisfy its burden of proving that the Pool Funds were not properly claimed as exempt entireties property.

### B.    Debtor's discharge is not denied.

In its ruling on the parties' motions for summary judgment,[79] the Court narrowed the issues of fact and ruled that a trial would be scheduled to determine whether Debtor's discharge should be denied on the following grounds:

(1)    under § 727(a)(2), based on Debtor's fraudulent transfer or concealment of the Pool Funds and the Truck;

(2)    under § 727(a)(3), based on Debtor's failure to keep adequate books and records related to the Pool Funds and payments from BCC or BCR; and

(3)    under § 727(a)(4), based on the four false oaths allegedly made by Debtor in his bankruptcy schedules.[80]

---

[78] Doc. No. 129-6, Def's Ex. 6; Doc. No. 129-7, Def's Ex. 7.
[79] Doc. Nos. 93, 94, 97, and 98.
[80] The factual issues are identified in the Court's August 3, 2022 *Amended Order (1) Denying Plaintiff's Motion for Summary Judgment, and (2) Granting in Part and Denying in Part Defendant's Motion for Summary Judgment* (Doc. No. 118). The Amended Order identifies a fifth alleged false oath related to whether Debtor had any interest in a non-exempt life insurance policy, but Plaintiff did not pursue its claim regarding the insurance policy at trial.

To promote the Bankruptcy Code's policy of providing debtors with a fresh start, objections to discharge are construed liberally in favor of the debtor and strictly against the objecting party.[81] Additionally, "[b]ecause denial of discharge is so drastic a remedy, courts may be more reluctant to impose it than to find a particular debt nondischargeable."[82] Denial of a debtor's discharge is a harsh and drastic penalty that is reserved for the most egregious misconduct by a debtor.[83]

Under Federal Rule of Bankruptcy Procedure 4005, "[a]t the trial on a complaint objecting to discharge, the plaintiff has the burden of proving the objection."[84] The party objecting to a debtor's discharge under § 727(a) bears the burden of proving each element of its objection by a preponderance of the evidence.[85]

### 1.    Section 727(a)(2)

Under § 727(a)(2), the Court shall grant the debtor a discharge unless the debtor transferred or concealed property within one year before the bankruptcy case with the intent to hinder, delay, or defraud a creditor.[86] For a debtor's discharge to be denied under § 727(a)(2), a plaintiff must prove that the transfer or concealment was within one year of the bankruptcy and was with actual intent to hinder, delay,

---

[81] *In re Delgado*, 2020 WL 4005786, at *6 (Bankr. M.D. Fla. July 14, 2020) (citations omitted).

[82] *In re Gonzalez*, 302 B.R. 745, 751 (Bankr. S.D. Fla. 2003) (citing *In re Johnson*, 98 B.R. 359, 367 (Bankr. N.D. Ill. 1988)).

[83] *In re Delgado*, 2020 WL 4005786, at *6 (citations omitted).

[84] Fed. R. Bank. P. 4005.

[85] *In re Delgado*, 2020 WL 4005786, at *7 (citations omitted).

[86] 11 U.S.C. § 727(a)(2).

or defraud a creditor.[87] "[T]he key is the debtor's intent. In other words, failure to disclose, alone, does not warrant denial of a discharge: a debtor's failure to disclose —i.e., concealment of—property must be with the *actual intent to hinder, delay, or defraud creditors*."[88]

At trial, the issues of fact under § 727(a)(2) were whether Debtor (a) fraudulently transferred the Truck within one year before the date he filed his bankruptcy case (the "Petition Date"), and (b) fraudulently concealed the Pool Funds.[89]

**a.    The Truck.** Debtor testified that he sold the Truck for $17,000.00 in August 2018 because he could not afford the payments, and Chad confirmed that approximately $17,000.00 was owed on the Truck at the time of the sale. After the sale, the Truck was used by employees of BCC or BCR, including Debtor, who only drove the Truck for business purposes. Although title to the Truck was not transferred to BCR until May 2019, the Court finds, first, the net value of the Truck appears to have been nominal, and second, that Plaintiff did not meet its burden of proving that Debtor transferred the Truck within one year before the Petition Date with the actual intent to defraud his creditors.

---

[87] *In re Delgado*, 2020 WL 4005786, at *7 (citation omitted).
[88] *In re Suwaity*, 638 B.R. 201, 218-19 (Bankr. M.D. Fla. 2022) (emphasis in original).
[89] Doc. No. 118, ¶ 6(a).

**b.    The Pool Funds.** Debtor asserts that he did not initially disclose the Pool Funds as an asset because he believed that he and Barbara had gifted the Pool Funds to Chad in 2016 and that the Pool Funds were not an asset belonging to Debtor on the Petition Date. Debtor and Chad did not document the arrangement in writing, and at trial they testified that they both considered the Pool Funds to be a gift. Debtor testified that he never asked Chad to repay the Pool Funds, and Chad testified that the repayments were voluntary.[90]

Although Debtor and Chad previously referred to the Pool Funds as a loan in their depositions,[91] Debtor explained at trial that he used the term "loan" because Chad had considered it a loan and paid back what he could afford.[92] Whether the Pool Funds were a gift or a loan, the Court finds that Debtor's belief that the Pool Funds were not a reportable asset is supported by the informal nature of the arrangement, the three and a half years that had passed between the transaction and the Petition Date, and the source of the Pool Funds from Debtor's exempt entireties property.[93]

---

[90] Doc. No. 149, p. 10.
[91] Doc. No. 148, p. 16.
[92] Doc. No. 144, Trial transcript, pp. 40-44.
[93] Doc. No. 148, p. 16.

The Court concludes that Plaintiff did not meet its burden of proving that the Pool Funds were an asset belonging to Debtor on the Petition Date, or that Debtor concealed the Pool Funds with actual intent to defraud his creditors.

### 2.    Section 727(a)(3)

Under § 727(a)(3), the Court shall grant the debtor a discharge unless the debtor has concealed or failed to keep any recorded information from which the debtor's financial condition might be ascertained, unless the failure was justified under the circumstances.[94] For a debtor's discharge to be denied under § 727(a)(3), an objecting party must prove (a) that the debtor concealed or failed to keep recorded information, and (b) that it is impossible to ascertain his financial condition as a result of the conduct.[95] "[T]he standard under § 727(a)(3) is not whether the Debtor followed best bookkeeping practices. The standard under § 727(a)(3) is whether the Debtor's failure to make or keep records makes it *impossible* to ascertain his financial condition and business transactions."[96]

At trial, the issues of fact under § 727(a)(3) were whether Debtor failed to keep adequate books and records related to (a) the Pool Funds, and (b) deposits of checks from BCC and BCR.[97]

---

[94] 11 U.S.C. § 727(a)(3).
[95] *In re Delgado*, 2020 WL 4005786, at *7 (citation omitted).
[96] *In re Suwaity*, 638 B.R. at 211 (emphasis in original).
[97] Doc. No. 118, ¶ 6(b).

a.      **The Pool Funds.** Debtor provided the Pool Funds to his son, Chad, in October or November 2016, more than three years before the Petition Date. Plaintiff does not dispute that Chad used the Pool Funds to install a pool at his home. Evidence of the arrangement includes the Synovus and SunTrust loan modifications from which the Pool Funds originated,[98] Chad's monthly checks to "repay" the Pool Funds,[99] and Debtor's 2018 and 2019 SunTrust bank statements reflecting his deposit of the checks.[100] Plaintiff did not show that it was unable to follow Debtor's transactions because Debtor did not keep additional documents regarding the Pool Funds. Based on the evidence, the Court finds that Plaintiff did not meet its burden of proving that Debtor unjustifiably failed to keep records of the Pool Funds, or that the absence of additional records regarding the Pool Funds makes it impossible to ascertain Debtor's financial condition.

b.      **Checks from BCC.** In 2018 and 2019, Chad wrote 19 checks to Debtor on BCC Account 9029. The checks totaled $20,492.28, and Debtor deposited the checks into Joint Account 5597. Debtor was employed by BCC or BCR during this period, and his duties included purchasing materials for the companies' jobs. Debtor testified that he periodically purchased the materials with his personal credit card, that he then turned over the receipts to Chad at BCR, and that BCR reimbursed him for the

---

[98] Doc. No. 129-19, Def's Ex. 19.
[99] Doc. No. 131-6, Pl's Ex. 16.
[100] Doc. No. 129-6, Def's Ex. 6; Doc. No. 129-7, Def's Ex. 7.

purchases with checks from BCC Account 9029. The transactions are evidenced by written records, including Debtor's Employee Pay History,[101] his tax returns for 2018 and 2019,[102] the reimbursement checks,[103] and the 2018 and 2019 SunTrust statements for Joint Account 5597 reflecting deposit of the checks.[104]

Based on this evidence, the Court finds that Plaintiff did not meet its burden of proving that Debtor unjustifiably failed to keep records of the reimbursement checks from BCC Account 9029, or that the lack of additional records regarding the reimbursement checks makes it impossible to ascertain Debtor's financial condition.

### 3. Section 727(a)(4)

Under § 727(a)(4), the Court shall grant the debtor a discharge unless the debtor made a false oath in the case.[105] For a debtor's discharge to be denied under § 727(a)(4), a plaintiff must prove that a false oath was (a) fraudulently made, and (b) related to a material fact.[106] A false oath "made by inadvertence or mistake will not suffice."[107] And as this Court held in *In re Delgado,* a debtor's discharge should not be denied because of minor errors or statements that do not relate to the debtor's business dealings or assets.[108]

---

[101] Doc. No. 129-9, Def's Ex. 9.

[102] Doc. No. 129-11, Def's Ex. 11; Doc. No. 129-12, Def's Ex. 12.

[103] Doc. No. 132-8, Pl's Ex. 31.

[104] Doc. No. 129-6, Def's Ex. 6; Doc. No. 129-7, Def's Ex. 7.

[105] 11 U.S.C. § 727(a)(4).

[106] *In re Delgado*, 2020 WL 4005786 at *9 (citations omitted).

[107] *In re Vecchio*, 2022 WL 16828243, at *8 (Bankr. M.D. Fla. Oct. 3, 2022).

[108] *In re Delgado*, 2020 WL 4005786 at *9.

At trial, the issues of fact under § 727(a)(4) were whether Debtor made false oaths regarding (a) whether he was a sole proprietor, (b) whether he had any connection with any business within four years prior to his bankruptcy petition, (c) whether Chad owed him any money for the Pool Funds, and (d) whether he transferred the Truck before the Petition Date.[109]

**a.    Sole Proprietor/Operation of a Business.** Debtor stated on his bankruptcy petition and SOFA that he was not a sole proprietor and that he did not have any connection to a business within four years before his bankruptcy case. Plaintiff contends that the statements are false because Debtor reported income on his 2018 and 2019 tax returns from a "construction remodeling, home remodeling" business.[110]

Debtor testified that he has not operated a business since Porky's in 2011 and that the income on the tax returns represents rental income from the Cape Coral Property, from his employment at BCR, or some small side jobs. The tax returns reflect relatively nominal earnings from BCC and BCR and nominal additional income from a "remodeling" business.

Plaintiff did not present any evidence that Debtor owned an actual "remodeling business" in 2018 and 2019. For example, Plaintiff did not introduce any

---

[109] Doc. No. 118, ¶ 6(c).
[110] Doc. No. 148, p. 22.

evidence that Debtor solicited jobs, entered contracts, or performed construction work for customers either in his own name or through a business. And even if Debtor's additional income did constitute income from the operation of a sole proprietorship or business—which the Court does not find—the omission of this information in Debtor's bankruptcy petition is not material. The Court concludes that Plaintiff failed to meet its burden of proving that Debtor fraudulently made a material false oath on his bankruptcy schedules.

      **b.**    **The Pool Funds.** Debtor stated on his original bankruptcy schedules that he was not owed any money by anyone, such as on an unpaid loan. Plaintiff contends that the statement is false because Chad had been repaying the Pool Funds since 2017 and continued to write monthly checks to Debtor as of the Petition Date.[111] As set forth above, Debtor and Chad provided inconsistent testimony regarding the Pool Funds.[112] But even if the Pool Funds were a loan, Debtor's belief that he was not required to disclose them is supported by (i) the source(s) of the Pool Fund from Debtor's exempt entireties property; (ii) the informal nature of the arrangement with Chad; (iii) and the three and a half years that had passed between the transaction and the Petition Date.[113]

---

[111] Doc. No. 148, p. 21.
[112] Doc. No. 148, p. 16.
[113] *Id.*

On this record, the Court finds that Debtor's omission of the Pool Funds in his original bankruptcy schedules was not material and that Plaintiff failed to meet its burden of proof to show that Debtor fraudulently made a materially false oath on his bankruptcy schedules.

      **c.**      **The Truck.** Debtor stated on his SOFA that he did not sell any property to anyone within two years before the Petition Date, other than in the ordinary course of business. Plaintiff contends that the statement is false because (i) Debtor received $17,000.00 from BCC for the Truck in August 2018; (ii) the Truck was transferred to BCR in May 2019; and (iii) Debtor filed his bankruptcy case in February 2020—within two years of both the payment and the transfer.[114] But Debtor and Chad both credibly testified that the Truck was sold for close to its fair market value, and Chad testified that the outstanding loan on the Truck was nearly $17,000.00.[115]

In *In re Moore*, the Eleventh Circuit Court of Appeals affirmed this Court's ruling that the debtors' initial failure to disclose the sale of two vehicles for $35,000.00 in their bankruptcy schedules was neither intentional nor material.[116] Here, the Court agrees that Debtor should have disclosed the sale of the Truck on his original bankruptcy schedules. But on the record before it, the Court finds that Debtor's

---

[114] Doc. No. 148, pp. 21-22.
[115] Doc. No. 149, pp. 20-21.
[116] *In re Moore,* 619 F. App'x. 951 (11th Cir. 2015).

nondisclosure was not material, and that Plaintiff failed to meet its burden to prove that Debtor fraudulently made a materially false oath on his bankruptcy schedules.

### III.    CONCLUSION

Early in this case, Plaintiff asserted its belief that Debtor had fraudulently concealed his ownership or control of BCC and BCR, and that Debtor was using the companies to disguise his property interests as income.[117] Although Plaintiff has never introduced any evidence to support this assertion, in the course of investigating its claims, Plaintiff discovered errors or omissions in Debtor's schedules relating to the Pool Funds, the Truck, and payments from BCC, BCR, or other sources.

Clearly, Debtor did not maintain complete records of his transactions with Chad, BCC, or BCR, and he amended his schedules and SOFA after Plaintiff's discovery efforts uncovered the Pool Loan and the sale of the Truck. But Debtor's errors and omissions are not the type of "most egregious misconduct" that is required for denial of a discharge under § 727(a).[118] Based on the evidence admitted at trial, and for the reasons explained above, the Court finds that Debtor is entitled to claim the Pool Funds as exempt entireties property and that Plaintiff has not met its burden of proof on its objections to Debtor's discharge.

---

[117] *See* Main Case, Doc. No. 17, ¶ 6; Doc. No. 64, ¶ 6; and Doc. No. 82, ¶ 4.
[118] *In re Delgado*, 2020 WL 4005786, at *6.

Accordingly, it is

**ORDERED:**

1.      Plaintiff's Objection to Exemption (Main Case, Doc. No. 100) is **OVERRULED,** and the Court will enter an order to that effect in the Main Case.

2.      The discharge of Debtor, John Steven Jeffries, is not denied under 11 U.S.C. § 727(a).

3.      The Court will enter a separate Final Judgment in favor of Debtor, John Steven Jeffries, and against Plaintiff, Webber Commercial Properties LLC.

The Clerk's Office is directed to serve a copy of this Order on interested parties via CM/ECF.